**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

*Electronically Filed*

| | | |
|---|---|---|
| **DAWN WEBER,** | ) | |
| **266 Kinderton Trail** | ) | |
| **Beavercreek, OH 45430** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | **CASE NO. _____** |
| | ) | |
| | ) | **JUDGE: _____** |
| **V.** | ) | |
| | ) | |
| **HARBORCHASE OF** | ) | |
| **BEAVERCREEK** | ) | **COMPLAINT** |
| **4175 Indian Ripple Rd.** | ) | |
| **Beavercreek, OH 45440** | ) | |
| | ) | **WITH JURY DEMAND** |
| **Serve:** | ) | |
| **BRYAN DAVENPORT** | ) | |
| **4175 Indian Ripple Rd.** | ) | |
| **Beavercreek, OH 45440** | ) | |
| | ) | |
| **HARBOR RETIREMENT** | ) | |
| **ASSOCIATES LLC** | ) | |
| **958 20th PL** | ) | |
| **Vero Beach, FL 32960** | ) | |
| | ) | |
| **Serve:** | ) | |
| **COGENCY GLOBAL, INC** | ) | |
| **C/O CHRIS COLLINS** | ) | |
| **1 15 North Calhoun St.,** | ) | |
| **Tallahassee, FL 32301** | ) | |
| | ) | |
| **DEFENDANTS** | ) | |

For the complaint against HarborChase of Beavercreek and their corporate owner, Harbor

Retirement Associates, LLC (collectively Defendants), Plaintiff allege and aver as follows:

1.     Throughout the COVID-19 pandemic, the Plaintiff, Dawn Weber stood ready, willing, and able to take safety precautions in the workplace as required by their past employer, even when that workplace asked them to reuse PPE and wear and reuse rain ponchos in place of proper gowns to prevent the spread of COVID-19 and protect her health and the health of those residents for whom they served as well as their co-workers. The Plaintiff, however, has religious beliefs and medical conditions that conflict with one of her past employer's safety policies: mandatory vaccination without the proper ability to have their protected conflicts rightfully considered.  The Plaintiff's conflicts are protected by federal and state law. This case is a challenge to the lawfulness of the policy imposed by the Defendant, the implication of said policy, as well as an attempt to prevent unlawful discrimination based on religion and disabilities in the future and to hold her past employer accountable for the harm they suffered at its hands.

2.   Federal and state law recognize an employee has a right to have religious beliefs and/or medical disabilities considered when those beliefs and disabilities conflict with an employer's policies, and, when possible, accommodated. The Defendants ignored federal and state law and instead applied its own set of illegal rules when it comes to religious and medical accommodations and exemptions to its mandatory COVID-19 vaccination policy (vaccine mandate/vaccine policy). (attached hereto as **Exhibit A)**. Defendant constructively denied Plaintiff's request by having no policy to allow religious exemptions to be considered. The medical exemption policy's required deadline for accommodations made it impossible for the Plaintiff to gather all the needed documents to submit a medical exemption to the covid vaccine mandate.  The religious exemption process did not exist at all.  This was done in violation of Defendant's obligations under Title VII of the Civil Rights Act of 1964 ("Title VII") and Section

4112.02 of the Ohio Revised Code ("O.R.C. § 4112.02") as well as The Americans with Disabilities Act (ADA) and the Ohio Fair Employment Practice Law (O.R.C. § 4112)

3. Defendants' actions left the Plaintiff with the impossible choice of either taking the COVID-19 vaccine, at the expense of her religious beliefs and her health, or losing her livelihood.

4. Under Title VII, the ADA, and Ohio law, an employer must provide a legitimate opportunity to seek a religious and medical accommodation. The employer cannot summarily impose employer-preferred workplace rules that abridge an employee's federally protected rights without genuine, good-faith dialogue and consideration of proposed accommodations with objective evidence, and, if the employer chooses to deny an employee accommodation request, proof that allowing the accommodation would place an undue burden on the employer. The conduct of the Defendants was in violation of these laws.

## PARTIES

5. Plaintiff, Dawn Weber, is a resident of the Dayton area of Ohio. The Plaintiff had been employed by the Defendant for just under three years. Ms. Weber has a sincerely held religious belief that precludes her from taking the COVID-19 vaccine. Additionally, her doctor has documented that her disabilities make getting the COVID-19 vaccine dangerous to her health to such an extent that he recommends against it.

6. The Defendant, HarborChase of Beavercreek, is incorporated in the State of Ohio, with its principal place of business 4175 Indian Ripple Rd. Beavercreek, OH 45440 . Defendant HarborChase is owned by Defendant, Harbor Retirement Associates LLC. Harbor Retirement Associates is incorporated in FL with its principal place of business 958 20th Pl, Vero Beach, FL

32960, United States. Under information and belief, actual direction, control, coordination, and

vaccine mandate originated from the Defendant employer in Beavercreek, Ohio.

## JURISDICTION AND VENUE

7.   This Court has jurisdiction over the parties pursuant to 28 U.S.C. § 1331

because the Complaint seeks relief and damages under federal statute, 42 U.S.C. § 2000e, *et seq.,*

and has supplemental jurisdiction over the Plaintiff's state law claim arising from the same

events and occurrences under O.R.C. § 4112.02 pursuant to 42 U.S.C. § 1367.

8.   Venue is proper in this district pursuant to U.S.C. § 1391(b) because

the relevant events took place in Beavercreek, Ohio, which is in the Southern District of Ohio,

Western Division and the Defendant's principal place of business is located therein.

9.   The Court has personal jurisdiction over the Defendant because the

Defendant resides and conducts business in this judicial circuit.

10. Plaintiff's claims for attorney's fees and costs are predicated upon Title

VII, 42 U.S.C. § 2000e-5, and as allowed under state law.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

11. On November 23, 2021, Plaintiff timely filed charges of disability

discrimination with the Ohio Civil Rights Commission ("OCRC"). OCRC has a dual filing

agreement with the Equal Employment Opportunity Commission ("EEOC").

12.      Plaintiff's Notice of Right to Sue from the OCRC was issued on May 26, 2022.

(attached hereto as **Exhibit B)**.

13.      Plaintiff's Notice of Right to Sue from the EEOC was received on July 5, 2022

(attached hereto as **Exhibit C)**.

14.      This Complaint is being timely filed.

4

15.     All administrative prerequisites to the filing of this suit have been meet.

## FACTS

16.     The Plaintiff has sincerely held religious beliefs which taking any of the three available COVID-19 vaccines violates. Ms. Weber also has medical issues, which were known to the Defendants at the time of her termination, required her not to take any of the then available COVID-19 vaccines. Shortly after being fired, her doctor confirmed her medical disability.

17.     The Plaintiff would have requested a religious accommodation, as well as a medical accommodation from the Defendant's vaccine mandate policy, had there been a proper process and enough time allotted by which to submit exemptions.

18.     The vaccine mandate dated on August 12, 2021, and presented to Ms. Weber on August 13th *see* **Exhibit A**, required all employees to be fully vaccinated against COVID-19 by September 13, 2021.

19.     Defendant's vaccine mandate did not provide for *any* process for an employee to file for a religious or medical exemption.

20.     Ms. Weber had to ask her boss, Executive Director, Bryan Davenport, how to submit a medical exemption.

21.     Davenport stated that she'd have to submit all of her medical records tracking back numerous years and have her exemption approved by the September 13th date or she would be fired. Plaintiff made Defendant aware that she was attempting to meet these conditions. She contacted her doctors to collect all the medical records and do any additional examinations to address her medical concerns.

22.     Because of the chaos in the healthcare system during the summer of 2021, Plaintiff was not able to get into her doctor's office, nor acquire all of her required medial

records until after the September 13, 2021 deadline. As a result, she was illegally terminated before she could complete her medical exemption request.

23.     After her termination, her doctor documented that she should not take the covid vaccines. (attached hereto **Exhibit D).**

24.     Defendants never provided any exemption policy. The only policy provided to Ms. Weber, and all the employees, was the August 12th document that stated: "**all HarborChase Associates must be vaccinated to remain employed in our communities and to serve our residents"** (emphasis in original)

25.     On the day the vaccine mandate was provided to the managers, including Ms. Weber, Davenport went so far as to tell the managers to "resign immediately," if they planned on not being vaccinated.

## ALLEGATIONS

26.     In March 2020, American life was irreparably changed both by COVID-19 and by various governments and employers' response to it. COVID-19 is a virus that was first detected in Wuhan, China, and eventually made its way to the United States of America, setting off a chain of events that has irretrievably changed the day-to-day life of many, if not most, Americans.

27.     In the spring of 2020, the Defendant began implementing procedures for its workforce, including several of the following requirements for its employees: masks, social distancing, temperature checks, COVID-19 testing, and self-quarantine. Upon information and belief, the Defendant had substantial success reducing the risk of COVID-19 spread through these efforts.

28.     Despite the Defendant's success in controlling the spread of COVID-19

in its workspace, the Defendant chose to implement a blanket vaccine mandate, based on reasoning unsupported by science, and has improperly implemented its vaccine mandate in violation of Title VII, the ADA, O.R.C. § 4112.01 and O.R.C. § 4112.02.

29.     Furthermore, the Defendant improperly terminated the Plaintiff for refusing to comply with one of its safety procedures – mandated vaccination – which has limited results in preventing the transmission of disease in the workplace, ignores natural immunity, and improperly assesses risk. All of this was done without proper opportunity and consideration of the Plaintiffs' rights and a legitimate opportunity to request accommodations based on her sincerely held religious beliefs, medical conditions, and whether the accommodations would be an undue burden on the Defendants, which is required under Title VII, the ADA and state law.

**The Defendant pivoted from successful and proven COVID-19 mitigation practices and improperly chose mandated vaccination as its sole safety procedure upon which it predicated employment.**

A. <u>The vaccine mandate is unlawful as enforced and written.</u>

30.     The Food and Drug Administration ("FDA") issued an Emergency Use Authorization ("EUA") for the Pfizer-BioNTech vaccine on December 1, 2020 for select populations. One week later a second EUA for the Moderna COVID-19 vaccine was issued. The FDA issued an EUA for the Johnson & Johnson COVID-19 vaccine on February 27, 2021. On August 23, 2021, the FDA issued full approval for the Pfizer-BioNTech COVID-19 vaccine marketed as Comirnaty.  However, it should be noted, that the FDA has admitted the Comirnaty vaccine, which is legally distinct from the Pfizer vaccine that is currently available in the UK, has never been available in the US.  On January 31, 2022, the FDA announced its approval of the

Moderna COVID-19 vaccine, to be marked as Spikevax, which has the same formulation as the EUA-approved Moderna vaccine.[1]

31.     Though the FDA has approved the use of a currently unavailable vaccine for future use, the only vaccines widely available for use in the United States are these three experimental, investigative, and unlicensed drugs, all of which were either developed, tested, or produced with the use of fetal cells from aborted fetuses.

32.     Since the rollout of the vaccines, more and more data increasingly show the vaccines do not prevent infection, do not prevent transmission, and do not prevent illness. Indeed, countries with the most aggressive, expansive use of the vaccines have seen record-setting infection rates and continuing high illness rates.

33.     Scientists studying over 4,000 frontline workers found that between December 2020 until April 2021, the effectiveness of the vaccines cratered from 91 percent to 66 percent. This drastic decline occurred before the Delta and Omicron variants became dominant variants.[2]

34.     Even more alarming, research focusing on the Pfizer vaccine's effectiveness in America shows that from December 14, 2020, until August 8, 2021, the vaccine plummeted in effectiveness, collapsing from 88 percent to 47 percent.[3]

---

[1] FDA, *Spikevax and Moderna COVID-19 Vaccine* (Jan. 31, 2022) available at https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/spikevax-and-moderna-covid-19-vaccine.

[2] Ashely Fowlkes, et al., *Effectiveness of COVID-19 Vaccines in Preventing SARS-CoV-2 Infection Among Frontline Workers Before and During B.1.617.2 (Delta) Variant Predominance – Eight U.S. Locations, December 2020-August 2021,* 70 Morbidity and Mortality Weekly Report (Aug. 27, 2021) available at https://www.cdc.gov/mmwr/volumes/70/wr/mm7034e4.com.

[3] Sara Y. Tartof, et al., *Six-month Effectiveness of BNT162b2mRNA COVID-19 Vaccine in a Large US Integrated Health System: A Retrospective Cohost Study,* Lancet, 2021 Oct. 16, 398 (10309):1407-16, available at https://pubmed.ncbi.nlm.nih.gov/34619098/.

35.     In addition, governmental authorities have revised their definition of the word "vaccine" itself to continue to label these experimental drugs with novel ingredients "vaccines" because they fail to meet the test of traditionally defined vaccines, which actually inoculated against infection and prevented transmission, neither of which these vaccines can any longer claim credit. This reflects the fact there has never been a successful COVID-19 vaccine in history due to the viral evolution each virus mutates into.[4]

B.  The vaccine mandate ignores natural immunity.

36.     The National Institutes of Health and other bodies have found that natural immunity to COVID-19 – that is, immunity cause by infection with COVID-19 and recovery – is incredibly strong. Specifically, antibodies against the spike protein of the COVID-19 virus remain in 98% of people who have recovered from the virus six to eight months after infection (the outer limit of the study was simply because the study was done on individuals where were six to eight months out of recovery, not because immunity begins to wear off).[5]

37.     Health and Human Services' Assistant Secretary, Dr. Admiral Brett Giroir stated in August 2021, in a nationally televised interview, that "there are still no data to suggest vaccine immunity is better than natural immunity. I think both are highly protective."[6]

38.     The data out of the State of Israel underscores this point. In a paper

---

[4] Katie Carrero, *Why did the CDC change its definition for 'vaccine'? Agency explains more as skeptics lurk,* MIAMI HERALD (Sept. 27, 2021) available at https://wwww.miamiherald.com/news/coronavirus/artcle254111268.html.
[5] NIH, *Lasting Immunity Found After Recovery from COVID-19*, NIH (Jan. 26, 2021), available at https://www.nih.gov/news-events/nih-research-matters/lasting-immunity-found-after-recovery-covid-19.

[6] FOX NEWS, *Admiral Brett Giroir explains natural immunity to COVID-19*, Admiral Brett Giroir (Aug. 13, 2021) available at https://www.youtube.com/watch?v=O641EW4okPs.

awaiting peer review, scientists out the State of Israel report that in studying thousands of patients, those whose only source of immunity was a vaccine (in the case of Israel, the Pfizer vaccine was used) had a 5.96 to 13.06-fold increased risk of a breakthrough infection with the Delta variant of COVID-19 over those whose immunity was natural.[7]

39.    Israel is one of the most vaccinated places in the world, with close to 80% of the country having been vaccinated. Israel's bout with the Delta variant of COVID-19 has demonstrated that the Pfizer vaccine, once considered the Cadillac of the three COVID-19 vaccines, is only 64% effective at preventing symptomatic cases of COVID-19.[8] Moreover, despite Israel's high vaccination rates, Israel is becoming "the world's COVID hotspot."[9]

40.    In addition, in a recent study concerning the Omicron variant, scientists found that the variant "can evade immunity from COVID-19 more so than any other previous variants discovered during the course of the pandemic."[10] "Researchers studied over 11,000 Danish households and found that those who had the Omicron variant had a 31 percent chance of a secondary attack rate (SAR), which refers to the probability an infection occurs

---

[7] Sivan Gazit, et al., *Comparing SARS-CoV-2 Natural Immunity to Vaccine -Induced Immunity: Reinfections Versus Breakthrough Infections*, medRvix (Aug. 25, 2021), available at https://www.medrxiv.org/content/10.1101/2021.08.24.21262415v1.full.pdf.
[8] Aaron Blake, *Vaccine doubters' strange fixation with Israel*, WASHINGTON POST (Jul. 22, 2021) available at https://www.washingtonpost.com/politics/2021/07/19/vaccine-skeptics-zero-israel-again-some-reasons/.
[9] Conor Boyd, *Israel is not the world's Covid hot spot: Cases sours despite country's trail blazing vaccine roll-out – sparking fears other highly-vaccinated countries will be hit by another wave due to jabs' waning immunity*, DAILY MAIL (Sept. 3, 2021) available at https://dailymail.co.uk/news/article-9951117/Isreal-worlds-covid-hotspot-0-2-population-catching-yesterday.html.
[10] Shirin Ali, *New study finds omicron variant better at evading immunity*, THE HILL (Jan. 3, 2021) available at https://thehill.com/changing-america/well-being/prevention-cures/588040-new-study-finds-omicron-variant-better-at citing and referencing https://www.medrxiv.org/content/10.1101/2021.12.27.21268278v1.

10

within a specific group like a household or close contacts."[11] Moreover, the study revealed that "vaccine effectiveness was reduced to around 40 percent against symptoms and to 80 percent against severe disease. . ."[12]

41.     The now well-known study of the effects of natural immunity in the Cleveland Clinic Health System provides yet another example of the real-world superiority of natural immunity to vaccine immunity. That study compared "breakthrough infections" (re-infection after either contracting COVID-19 or taking a vaccine) among employees of the Cleveland Clinic Health System and found that those who were previously infected and unvaccinated, 1359 people, none suffered breakthrough infections. [13]

42.     Another newly published study found that there is "no discernable relationship between percentage of population fully vaccinated and new COVID-19 cases in the last [seven] days."[14] The study found to the contrary that there was a "marginally positive association such that countries with higher percentage of population fully vaccinated have higher COVID-19 cases per [one] million people."[15] That study, which analyzed 68 different countries' vaccination rates and the rate of new COVID-19 cases, specifically referred to Israel, Portugal and Iceland, each of which is highly vaccinated and which had more cases per one million

---

[11] *Id.*

[12] *Id.*

[13]Nabin K. Shrestha, et al., *Necessity of COVID-19 Vaccine in Previously Infected Individuals*, medRxiv (Jun. 19, 2021), available at https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v3.

[14] S.V. Subramanian and Aknil Kumar*, Increases in COVID-19 are Unrelated to Levels of Vaccination Across 68 Countries and 2947 Counties in the United States,* Eur J Epidemiol 2021 Sep 30:1-4, https://doi.org/10.1007/s10654-021-00808-7, available at https://link.springer.com/article/10.1007/s10654-021-00808-7.

[15] *Id.*

people than, for example, Vietnam and South Africa, which had around ten percent of their population fully vaccinated.[16]

43.     Several scholarly journals have also weighed in on the superiority of natural immunity to vaccine immunity.[17] Further, those who previously were infected with COVID-19 were at greater risk for bad side effects associated with the vaccine - in such cases, the vaccine might even weaken their pre-existing immunity.[18]

44.     While the vaccines have been effective at preventing serious cases and deaths, they lag far behind natural immunity in preventing symptomatic cases of COVID-10, and, therefore, transmission of COVID-19.

C.     The vaccine mandate relies on an improper assumption about the infection-fatality rate and asymptomatic spread.

45.     COVID-19 presents a risk primarily to individuals aged 85 or older [19] and those with comorbidities such as hypertension and diabetes.[20]

46.     The majority of deaths associated with COVID-19 occur in those

---

[16] *See id.*

[17] Jackson S. Turner, et al., *SARS-CoV-2 Infection Indicates Long-lived Bone Marrow Plasma Cells in Humans*, NATURE, 595, 421-25 (May 24, 2021), available at https://www.nature.com/articles/s41586-021-03647-4.

[18] Carmen Camara, et al., *Differential Effects of the Second SARS-CoV-2 mRNA Vaccine Dose on T Cell Immunity in Naïve and COVID-19 Recovered Individuals*, bioRxiv (Mar. 22, 2021) https://doi.org/10.1101/2021.03.22.436441, available at https://www.biorxiv.org/content/10.1101/2021.03.22.436441v1.

[19] Mayo Clinic, *COVID-19: who's at higher risk of serious symptoms* (Jan. 22, 2022) available at: https://www.mayoclinic.org/diseases-conditions.

[20] Wren Hann, et al., *Comorbidities in SARS-CoV-2 Patients: a Systematic Review and Meta-Analysis*, ASM Journals/mBio/Vol.12, No. 1 (Feb.9, 2021) https://doi.org/10.1128/mBio.03647-20, available at  https://journals.asm.org/doi/10.1128/mbio.03647-20?permantly+true&.

over the age of 55.[21] Within the most heavily impacted age group (age 85 and up), only 13.3% of

deaths from February 2020 to February 2021 were attributed to COVID-19.[22]

47.     One of the most useful measures for calculating the risk of dying from a

virus is the infection-fatality rate ("IFR"). The IFR is calculated by dividing the number of

COVID-19 deaths by the number of COVID-19 infections. It attempts to answer the critical

question: "If I get sick, what is the chance that I will die?" The Center for Disease Control and

Prevention ("CDC") estimates the IFR for the bulk of most working-age adults is exceedingly

low.[23] For adults under age 50, the CDC's "current-best estimate" is that 500 people will die per

1,000,000 infections nationwide.[24] In other words, for every one million adults infected age 50 or

younger, 999,500 of them will survive COVID-10.[25]

48.     Assuming the data regarding COVID-19 infections is accurate, the

CDC's numbers show Americans across the board are far more likely to die of something other

than COVID-19, which casts considerable doubt on the Defendant's assertions that all

employees should be vaccinated.[26]

49.     The Defendant already employs a very successful method of preventing

---

[21] *Id.*

[22] Heritage Foundation, *COVID-19 deaths by age* (Feb. 17, 2021) available at
https://datavisualizations.heritage.org/public-health/covid-19-deaths-by-age/.

[23] CDC, *COVID-19 Pandemic Planning Scenarios* (Mar. 19, 2021) available at
https://www.cdc.gov/oronavirus/2019-ncov/hcp/planning-scenerios.html.

[24] *Id.*

[25] *Id.*

[26] Smiriti Mallapaty, *The Coronavirus Is Most Deadly If You Are Older and Male,* NATURE
(Aug. 28, 2020) (demonstrating that individuals under 50 face a negligible threat of a severe
medical outcome from a coronavirus infection, akin to the types of risk that most people take in
everyday life, such as driving a car) available at https://www.nature.com/articles/d41586-020-
02483-2.

COVID-19 spread from the symptomatic – self-quarantine. The Defendant's vaccine mandate only addresses one risk: asymptomatic lethal spread. The problem with the Defendant's mandate is two-fold: first, asymptomatic lethal spread is significantly less of a threat than the Defendant seems to assert,[27] and second, testing more effectively and easily, suffices rather than forced injections of unwanted experimental, potentially life-altering drugs developed in ways that offend the Plaintiffs' religious beliefs, discriminates against them because of their sincerely held religious beliefs or conflicts with the ADA and/or state laws.

50.     The Defendant uses the specter of "asymptomatic spread" – the notion that fundamentally healthy people could transmit COVID-19 to others without having any symptoms of COVID-19 – to justify its vaccine mandate. But there is little credible scientific evidence that demonstrates the phenomenon of "asymptomatic spread" poses any meaningful danger to employees or anyone else for that matter. Indeed, it is "very rare" even according to Anthony Fauci, and, at worst, poses a one-in-a-million risk of lethal spread. The Defendant's response to COVID-19 is predicated, in part, on the flawed assumption that asymptomatic individuals pose a meaningful risk of spreading disease.

51.     Evidence of transmission requires that an individual can be shown to be the source of infection for another person who then developed symptoms of a disease/illness.

---

[27] Michael A. Johansson, et al., *SARS-CoV-2 Transmission from People Without COVID-19 Symptoms,* JAMA Netw. Open, 2021; 4(1):e2035057 (Jan. 7, 2021) http://doi.10.1001/Jamanetworkopen.202.35057, available at https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2774707. *See also* Kenneth McIntosh, et al., *COVID-19: Epidemiology, Virology, and Prevention,* WoltersKluner (Jan. 13, 2022) available at https://www.uptodate.com/contents/covid-19-epidemiology-virology-and-prevention#H3392906512.

52.     Basic microbiology shows that infectiousness or transmission of viruses such as COVID-19 require an active infection resulting in elevated levels of viral replication in the host and shedding of the virus.[28]

53.      Decades of research demonstrates that symptomatic people, such as those coughing, sneezing, and wheezing, are the real drivers of viral spread, a fact Dr. Anthony Fauci initially acknowledged during the early days of the pandemic when he told the press, "[E]ven if there is some asymptomatic transmission, in all the history of respiratory-born viruses of any type, asymptomatic transmission has never been the driver of outbreaks. The driver is always a symptomatic person." [29]

54.     When the viral replication process is blocked by a healthy immune system, the virus is neutralized, preventing significant viral replication and shedding. This occurs in approximately half the people exposed to the virus. Their immune system's defenses effectively ward off COVID-19 before it can take hold and cause symptomatic disease. Research demonstrated that asymptomatic people are not the drivers of COVID-19 transmission as demonstrated in the following points.

55.     Researchers studying real-world laboratory samples of more than a quarter-million people found that, even with a positive RT-PCR test, asymptomatic people have a much lower probability of being infectious.[30]

---

[28] *See generally*, Samuel Baron, et al., *Medical Microbiology* (4th ed. 1996) available at: https://www.ncbi.nlm.nih.gov/books/NBK8149/. *See also* Hitoshi Kawasuji, et al., *Transmissibility of COVID-19 depends on the viral load around onset in adult and symptomatic patients*, PLOS ONE (Dec. 9, 2020) available at https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0243597.

[29] U.S. Department of Health and Human Services, *Update on the New Coronavirus Outbreak First Identified in Wuhan, China*, Press Briefing (Jan. 28, 2020) available at https://www.youtube.com/watch?v=w6koHkBCoNQ&t=2642s

[30] Andreas Stang, *The Performance of the SARS-CoV-2-RT-PCR Test as a Tool for*

56.     A research article published in the CDC's *Emerging Infectious Diseases*
journal notes that little to no transmission of COVID-19 occurred from asymptomatic people
studied by research in Germany.[31] The researchers note: "The fact that we did not detect any
laboratory-confirmed SARS-CoV-2 transmission from asymptomatic case-patients is in line with
multiple studies . . ."[32] The lack of scientific and medical evidence surrounding asymptomatic
spread led the researchers to conclude that asymptomatic spread is "unlikely to substantially
spread COVID-19.[33]

57.     A review in March 2021 of all the published meta-analysis on
asymptomatic transmission from Dr. John Lee, a retired British Professor of Pathology, reveals
that in many cases, the same few studies have been recycled repeatedly to support the flawed
proposition that those who are asymptomatic pose a real danger.[34] In the words of Allyson M.
Pollock, a professor of public health at Newcastle University in the United Kingdom,
"[s]earching for people who are asymptomatic yet infectious is like searching for needles that
appear and reappear transiently in haystacks, particularly when rates are falling."[35]

58.     Moreover, according to FDA, there is insufficient data to determine the

---

*Detecting SARS-CoV-2 Infection in the Population,* 83 J. Infect. 2 (Aug. 2021),
https://doi:10.10161j.jinf.2021.05.022  available at
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8166461/.

[31] Jennifer K. Bender, *Analysis of Asymptomatic and Presymptomatic Transmission in SARS-CoV-2 Outbreak, Germany, 2020,* 27 Emerging Infectious Diseases 4 (April 2021) available at
https://www.cdc.gov/cid/article/27/4/20-4576_article.

[32] *Id.*

[33] *Id.*

[34] *See* John Lee, *Asymptomatic spread: who can really spread COVID-19,* Health advisory &
Recovery Team (Mar. 2021) available at https://www.hartgroup.org/wp-content/uploads/2021/03/ASYMPTOMATIC-SPREAD.pdf.

[35] Allyson M. Pollock, *Asymptomatic Transmission of Covid-19,* BMJ (Dec. 21, 2020) available
at https://www.bmj.com/content/371/bmj.m4851.

vaccines authorized for emergency use actually prevent asymptomatic infection or the transmission of SARS-CoV-2, the virus that causes COVID-19.[36]

59.     Recently, the CDC reported that "new scientific data" demonstrated that vaccinated people who experienced breakthrough infections carried similar viral loads to the unvaccinated (but not naturally immune), leading the CDC to infer that vaccinated people transmit the virus at concerning levels.[37]

60.     The Defendants' vaccine mandate "accommodation" – limiting asymptomatic unvaccinated employees from its workplace by terminating them – flies in the face of the current scientific literature, which shows asymptomatic spread of COVID-19 is virtually non-existent.

61.     In sum, little objective evidence exists to support a finding that asymptomatic spread is a driver of COVID-19 and, therefore, poses a danger to the Defendant's workplace including co-workers and/or residents. Rather, the epidemic spread of COVID-19 is propelled almost exclusively by symptomatic persons (many of whom are fully vaccinated) who can easily self-isolate or quarantine from their co-workers.

62.     A reasonable accommodation to vaccination is not to terminate workers, and further to ban them from the workplace. The Defendant's vaccine mandate is nonsensical, unjust, and a violation of federal and state law.

63.     The government-operated Vaccine Adverse Event Reporting System

---

[36] FDA, *Pfizer-BioNTech COVID-19 Vaccine Frequently Asked Questions,* (Nov. 19, 2020) available at https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/pfizer-biontech-covid-19-vaccine-frequently-asked-questions.

[37] *See CDC reversal on indoor masking prompts experts to ask, "Where's the data?",* WASHINGTON POST (Jul. 28, 2021) available at https://www.washingtonpost.com/health/breakthrough-infections-cdc-data/2021/07/28/dcaaa6b2-efce-11eb-a452-4da5fe48582d_story.html.

("VAERS") database is intended to function as an "early warning" system for potential health risks caused by vaccines. Presently, VAERS is broadcasting a red alert, but the Defendant is refusing to take account this important data of adverse reactions to the vaccines and instead is barreling down the tracks of forced vaccination at full steam.

64.     Recent data presents an alarming picture. As of early September 2022, there have been 30,796 deaths reported to VAERS from COVID-19 vaccines, compared to just 8,673 for the preceding 30 years for all other vaccines.[38] According to Josh Guetzhow, Ph.D., there are 91 times the number of deaths and 276 times the number of coagulopathy events reported after COVID-19 vaccination than after flu vaccination. [39]

65.     Moreover, new research suggests the heightened risk of adverse effects results from "preexisting immunity to SARS-CoV-2 [that] may trigger intense, albeit relatively rare, inflammatory and thrombotic reactions in previously immunized and predisposed individuals," establishing individuals who have suffered from COVID-19 and recovered, and are forced to vaccinate, are likely to experience those adverse events the government deemed as "rare".

66.     Although the number of VAERS reports is alarming in its own right, it is likely the true number of adverse effects associated with the COVID-19 vaccines far exceeds cases reported to VAERS. In 2010, a federal study commissioned by the U.S. Health and Human Services and performed by Harvard University consultants on behalf of the Agency for Health care Research and Quality ("AHRQ") found that "fewer than 1% of vaccine adverse events" are

---

[38] Josh Guetshow, *Safety signals for COVID vaccines are loud and clear. Why is Nobody Listening?* THE DEFENDER (Sept. 29, 2021) available at https://childrenshealthdefendse.org/defender/safety-signals-covid-vaccines-full-transparency-cdc-fda/.
[39] *Id.*

ever reported to VAERS.[40] Thus, it is likely that scores of adverse events associated with the COVID-19 vaccines, including deaths, go unreported.

67.     It is not just VAERS that is broadcasting a red alert. On October 1, 2021, the European Union's drug regulator, the European Medicines Agency ("EMA"), identified a new possible link between rare cases of blood clotting in deep veins with Johnson & Johnson's COVID-19 vaccine.[41] The EMA said the new, possibly life-threatening clotting condition known as venous thromboembolism ("VTE") should be included on the Johnson & Johnson product label as a possible side-effect of the shot.[42]

68.     What is more, the Moderna and Pfizer vaccines are made with polyethylene glycol ("PEG") and Johnson & Johnson uses a similarly problematic ingredient: polysorbate.[43] PEG has been linked to anaphylaxis in numerous recipients of the vaccine. PEG is the delivery mechanism to the cells that keeps the mRNA from dispersing and not reaching its intended target. PEG performs its intended use. Unfortunately, about 70% of the U.S. population is slightly to somewhat allergic to PEG. The National Institute of Health ("NHI") recently began

---

[40] Ross Lazerus, et al. *Electronic Support for Public Health – Vaccine Adverse Event Reporting System (ESP:VAERS),* Agency for Healthcare Research and Quality (Sept. 30, 2010) available at https://digital.ahrq.gov./sites/default/files/docs/publication/r18hs017045-lazarus-final-report-2011.pdf.

[41] Reuters, EU finds J&J COVID shot possibly linked to another rare clotting condition, REUTERS (Oct. 1, 2021) available at https://www.reuters.com/business/healthcare-pharmaceuticals/eu-finds-jj-covid-shot-possibly-linked-another-rare-clotting-condition-2021-10-01/.

[42] *Id.*

[43] CDC, *COVID-19 Vaccines for People with Allergies* (Dec. 14, 2021) available at https://www.cdc.gov/coronavirus/2019-ncov/vaccines/recommendations/specific-groups/allergies.html.

a clinical trial of "systematic allergic reaction to the Moderna or Pfizer-BioNTech COVID-19 vaccines" due to the recipients of those vaccines experiencing anaphylaxis.[44]

69.     According to the CDC, individuals who are allergic to PEG should not take the Moderna or Pfizer vaccines, and those who are allergic to polysorbate should not take the Johnson & Johnson vaccine.[45]

70.     Despite this known risk, the Defendant did not offer PEG allergy testing pre-vaccination and never offered any indemnity or disability coverage from any of the known and potential adverse effects of the COVID-19 vaccines.

71.     To summarize, the potential adverse effects Plaintiffs faced in being coerced to receive the COVID-19 vaccines pursuant to the Defendants' vaccine mandate is not theoretical, hypothetical or academic – they are very real and have real victims. Given the alarming reports of adverse side-effects associated with the COVID-19 vaccines, subjecting Plaintiff to vaccination exposes them to a variety of health risks ranging from headaches and blood clots to death.

**The Defendant improperly refused to consider the Plaintiff's religious exemption in violation of Title VII and O.R.C. § 4112.02**

A.  The Defendant's improper conduct regarding the vaccine mandate policy and procedures and its communications with the Plaintiff regarding her request for a religious exemption.

72.     On August 12, 2021, the Defendant announced its vaccination policy. Se*e* **Exhibit A**.

73.     The vaccination mandate stated in part (emphasis in original):

---

[44] NIH, *NIH begins study of allergic reactions to Moderna, Pfizer-BioNTech COVID-19 vaccines* (Apr. 7, 2021) available at https://www.nih.gov/news-events/news-releases/nih-begins-study-allergic-reactions-moderna-pfizer-biontech-covid-19-vaccines.
[45] *See id.* at note 43.

After much thought and deliberation, we have very responsibly decided **all HarborChase Associates must be vaccinated to remain employed in our communities and to serve our residents. As the organization that has been chosen by our residents and their families to care for them and provide for their lifestyle, it is our responsibility to do everything reasonable and necessary to keep our residents safe. Unvaccinated Associates have 30 days (by September 13th) to comply.** Vaccinations continue to be the most important driver in ensuring the well-being of residents and staff across this industry, and it is our responsibility to ensure that our Associates are vaccinated.

*See id.*

74.     The vaccine mandate did not provide for procedures for seeking a religious and/or medical exemption from the vaccine mandate.

75.     No updates to the August 12, 2021 policy were ever issued.

76.     Instead, employees had to take it upon themselves to ask Defendants about exemption policies.

77.     At no time did the Defendants provide the Plaintiff, nor anyone else, an opportunity to file for a religious exemption.

78.     At the time of her termination, Ms. Weber was completely unaware of her rights under Title VII.

79.     Had the Defendants not created a culture of bullying, and a general lack of transparency and information, Ms. Weber would have filed for a religious exemption.

80.     The Plaintiff was terminated for not taking the COVID-19 vaccine which she had the legal right to request an accommodation to.

81.     Upon information and belief, the Defendant received zero religious accommodation requests having effectively eliminated the opportunity to file for a religious exemption.

82.     In no fair reading of the law is the employee required to determine and update company policies for their rights under Title VII for those rights to be protected.

83.     While the production of the vaccines did not reportedly require any new abortions, Plaintiff objects to receiving the COVID-19 vaccines on the basis that, even assuming the vaccines do confer a meaningful health benefit, that benefit is one from ill-gotten gains.

84.     Plaintiff believes any benefit the COVID-19 vaccines may confer, flows from the unjust exploitation of unborn human life. Plaintiff refuses on religious ground to accept or be forced to accept the COVID-19 vaccines.

85.     Plaintiff objects to receiving the COVID-19 vaccine because she is a Christian, her body is the temple of the Holy Spirit and, as a Christian, she is compelled to protect her body from defilement. Insofar as the COVID-19 vaccines also contain neurotoxins, hazardous substances, attenuated virus, animal parts, foreign DNA, albumin from human blood, carcinogens and chemical wastes that a proven harmful to the human body, the Plaintiff finds the taking of the vaccine to be in direct conflict with her Christian duty to protect her body as the temple of the Holy Spirit.

B.   Scientific support for the Plaintiff's sincerely held beliefs.

86.     Presently, all COVID-19 vaccines have made use either in production or testing of fetal cell lines developed from tissues originally derived from aborted fetuses.[46] For example, the Johnson & Johnson vaccine used fetal cells cultures, specifically PER. C6, a retinal cell line that was isolated from terminated fetus in 1985.[47]

---

[46] *See* Los Angeles County Public Health, *COVID-19 Vaccine and Fetal Cell Lines*, https://publichealth.lacounty.gov/media/coronavirus/docs/vaccine/vaccinedevelopment_fetalcelllines.pdf.
[47] *Are the vaccines made with fetal cells,* Institute for Clinical Systems Improvement, https://www.icsi.org/covid-19-vaccine-aq/are-the-mma-vaccines-made-with-fetal-cells.

87.     As for the EUA-Pfizer and Moderna COVID-19 vaccines, fetal cell line

HEK 293 was used during the research and development phase.[48] All HEK 293 cells are

descended from tissue taken in 1973 from either an elective abortion or miscarriage that took

place in the Netherlands. [49]

C.  Federal law and State law prohibiting religious discrimination.

88.     Title VII prohibits the Defendant from discriminating against employees

based on their religion. This "include[s] all aspects of religious observance and practice, as well

as belief, unless an employer demonstrates that he is unable to reasonably accommodate an

employee's . . . religious observance or practice without undue hardship on the conduct of the

employer's business." 42 U.S.C. § 2000e(j).

89.     Title VII "imposes upon employers a 'statutory obligation to make

reasonable accommodation for the religious observances of its employees, short of undue

hardship." *Reed v. International Union, United Automobile, Aerospace and Agricultural

Implement w\Workers of America*, 569 F.3d 576, 579 (6th Cir. 2009).

90.      One of the most important analyses that must be completed to deny a religious

exemption is for the employer to determine if providing a religious accommodation would create

an undue burden.

91.      "An employer must . . . present evidence of undue hardship" and not "rely merely

on speculation," *Smith v. Pyro Min. Co.,* 827 F.2d 1081, 1085-86 (6th Cir. 1987). The lack of

---

[48] *See* Nebraska Medicine, *You asked, we answered: Do the COVID-19 vaccines contained aborted fetal cell?,* available at https://www.nebraskamed.com/COVID/you-asked-we-answered-do-the-covid-19-vaccines-contain-aborted-fetal-cells.
[49] *See* Los Angeles County Public Health, *COVID-19 Vaccine and Fetal Cell Lines*, https://publichealth.lacounty.gov/media/coronavirus/docs/vaccine/vaccinedevelopment_fetalcelllines.pdf.

substantive content in the Defendant's justification here demonstrates that the Defendant cannot

show undue hardship or even that undue burden was ever properly considered

92.    An employer must demonstrate attempted accommodation before it

claims undue hardship as a defense. *See, e.g., Redmond v. GAF Corp.,* 574 F.2d 897, 901-02 (7th

Cir. 1978); *Shaffeld v. Northrop Worldwide Aircraft Serv., Inc.,* 373 F. Supp. 937, 944 (M.D.

Ala. 1974).

93.    As described above, the Defendants did not provide a process by which a

religious accommodation would be accepted.  As a result, by information and belief, did not

conduct an undue burden analysis.

94.    Moreover, the Defendant clearly could have considered

accommodations as dictated by the EEOC. In May 2021, the EEOC issued guidelines addressing

the COVID-19 vaccines and rights and obligations of employers, titled *"What You Should Know*

*About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws – Technical*

*Assistance Questions and Answers"* (*"EEOC COVID-19 Guidance"*). The *EEOC COVID-19*

*Guidance* provides "examples of reasonable accommodations or modifications that employers

may have to provide to employees who do not get vaccinated due to disability; religious beliefs,

practices, or observance; or pregnancy." Reasonable accommodations the EEOC has identified

as potentially not imposing an undue hardship on the employer include requiring the

unvaccinated employee entering the workplace to:

(1)  wear a face mask,

(2)  work at a social distance,

(3)  work a modified shift.

(4)  get periodic tests for COVID-19,

(5) be given the opportunity to telework, or

(6) accept a reassignment.

*See EEOC COVID-19 Guidance,* K.2.

95. Beginning in March 2020, the Defendant had the opportunity to test many relevant accommodations for its employees, including daily assessments of personal health and potential exposure, availability of targeted COVID-19 testing, protocols requiring non-work when symptomatic or potentially exposed to COVID-19, contact tracing, handwashing and hygiene, and the use of PPE.

96. Such accommodations are understood to have prevented many substantial or material transmissions of COVID-19 when used.

97. In addition, other accommodations are potentially available. For instance, the EEOC has specifically identified testing of employees before they enter the workplace. The *EEOC COVID-19 Guidance* states, "an employer may choose to administer COVID-19 testing to employees before initially permitting them to enter the workplace and/or periodically to determine if their presence in the workplace poses a direct threat to others." *See EEOC COVID-19 Guidance*, A.6.

98. The Defendant's nonexistent vaccine exemption process, and verbal communication about possible exemptions not being worth the time to file because they would not be granted, failed to provided employees even the illusory ability to obtain a religious exemption from the vaccine mandate.

99. The Defendant did not engage the Plaintiff in a give and take discussion about potential accommodations. Plaintiff's willingness to comply with other safety measures were ignored.

100.     It is well established that Title VII and O.R.C. § 4112 "have the same evidentiary standards and general analysis." *Gibbons v. Bair Foundation,* No. 1:04CV2018, 2007 WL 582314, at *4-5 (N.D. Ohio Feb. 20, 2007) citing *Greene v. St. Elizabeth Hosp. Med. Ctr.,* 134 F.3d 371, 1998 WL 13410, at *5 (6th Cir. 1998).

101.     Given these facts, the Defendant's vaccination policy, via their lack of policy, was effectively an overreaching and unnecessarily violation of federal and state law.

### The Defendant improperly refused to consider the Plaintiff's medical exemption in violation of The ADA and and O.R.C. § 4112.02

A.   The Defendant's improper conduct regarding the vaccine mandate policy and procedures and its communications with the Plaintiff regarding her request for a medical exemption.

102.     On August 12, 2021, the Defendant announced its vaccination policy.

See **Exhibit A**.

103.     The vaccination mandate stated in part (emphasis in original):

> After much thought and deliberation, we have very responsibly decided **all HarborChase Associates must be vaccinated to remain employed in our communities and to serve our residents. As the organization that has been chosen by our residents and their families to care for them and provide for their lifestyle, it is our responsibility to do everything reasonable and necessary to keep our residents safe. Unvaccinated Associates have 30 days (by September 13th) to comply.** Vaccinations continue to be the most important driver in ensuring the well-being of residents and staff across this industry, and it is our responsibility to ensure that our Associates are vaccinated.

*See id.*

104.     The vaccine mandate did not provide for procedures for seeking a medical exemption from the vaccine mandate.

105.     No updates to the August 12, 2021 policy were ever issued.

106.     Instead, employees had to take it upon themselves to ask Defendants about exemption policies.

107.     Ms. Weber asked her direct boss, Davenport, how to file for a medical exemption. As documented above, the process required, along with the short time frame allowed, made it impossible for Ms. Weber to file an accommodation request to exert her legally protected rights.

108.     At the time of her termination, the Defendants were aware that Ms. Weber was attempting to gather all of her required medical documents and get an appointment to see her doctor.

109.     Her doctor did not have any openings for her prior to the vaccine mandate deadline.

110.     Had the Defendants not created a culture of bullying, and a general lack of transparency and unreasonable timeline, Ms. Weber would have filed for a medical exemption.

111.     On October 28, 2021 Ms. Weber was finally able to see her doctor. He concluded, that because of her medical conditions, she should not take the COVID-19 vaccine.  *See* **Exhibit D**

## COUNTS

### COUNT ONE

**Violation of Title VII, 42 U.S.C. § 2000e,** *et seq.*
**Religious Discrimination-Failure to Accommodate**

112.     Plaintiff restates the foregoing paragraphs as if set forth fully herein.

113.     At all times relevant, Plaintiff was Defendant's "employee" within the meaning of 42 U.S.C. § 2000e(f).

114.     At all times relevant, the Defendant was Plaintiff's "employer" within

the meaning of 42 U.S.C. § 2000e(b).

115.    Plaintiff holds sincere religious beliefs that preclude her from receiving a COVID-19 vaccine.

116.    The Defendant refused to engage in a meaningful interactive process with the Plaintiff regarding her religious accommodation opportunities.

117.    The Defendant failed to provide the Plaintiff with reasonable accommodations for her religious belief, instead terminating her for failing to violate her sincerely held beliefs and obtain a vaccination.

118.    By failing to engage in the interactive process or offer any reasonable accommodation, the Defendant's discriminatory actions were intentional and/or reckless and in violation of Title VII.

119.    It is reasonable to infer from the totality of the circumstances that Defendant did not bother engaging in an interactive process with those seeking religious exemptions because the Defendant intended to discriminate against those seeking religious exemptions and never intended to provide them with a reasonable accommodation.

120.    The Defendant illegally and improperly failed to identify potential accommodations as required by state and Federal law. The Defendant cannot assert the defense of undue hardship because it did not assert or show undue hardship in declining to accommodate the Plaintiff's sincerely held religious beliefs and no undue burden exists here regardless.

121.    By discriminating against Plaintiff, because of her sincerely held religious beliefs, in their decision to effectively deny Plaintiff's legitimate religious exemption, the Defendant violated Title VII. And this violation has harmed and continues to harm Plaintiff.

122.    Due to the Defendant's improper, willful, intentional, and unlawful

Actions, and the subsequent harm suffered by the Plaintiff, the Plaintiff asks the Court for the relief requested in her Prayer for Relief.

## COUNT TWO

**Violation of O.R.C. § 4112, *et seq.,***
**Religious Discrimination-Failure to Accommodate**

123.     Plaintiff restates the foregoing paragraphs as if set forth fully herein.

124.     By failing to engage in the interactive processor offer any reasonable accommodation, the Defendant's discriminatory actions were intentional and/or reckless and in violation of O.R.C. § 4112, *et seq.*

125.     It is reasonable to infer from the totality of the circumstances that Defendant did not bother engaging in an interactive process with those seeking religious exemptions because the Defendant intended to discriminate against those seeking religious exemptions and never intended to provide them with a reasonable accommodation.

126.     By discriminating against Plaintiff, because of her sincerely held religious beliefs, in their decision to deny Plaintiff's legitimate religious exemption, the Defendant violated O.R.C. § 4112, *et seq.* And this violation has harmed and continues to harm Plaintiff.

127.     Due to the Defendant's improper and willful, intentional, and unlawful actions, conducted with malice and aggregated and egregious fraud, and the subsequent harm suffered by the Plaintiff, the Plaintiff asks the Court for the relief requested in her Prayer for Relief.

## COUNT THREE

**Violation of The Americans with Disabilities Act of 1990, as Amended ("ADA") 42 U.S.C. § 12111,** *et seq.*
**Discrimination on the Basis of Actual Disability**

128.     Plaintiff restates the foregoing paragraphs as if set forth fully herein.

129.     At all relevant times, Plaintiff was Defendant's "employee" and a "qualified individual" as defined under the ADA 42 USC 12111(4), (8)

130.     Under the terms of the ADA, one is considered to have a disability of he or she: has (A) a physical or mental impairment that substantially limits one or more of that person's major life activities; (B) has a record of such impairment; or (C) is regarded as having such an impairment…" 42 U.S.C § 12102(1).

131.     To establish a disability under the first definition, having an actual impairment, the EEOC provides:

[A] person … [has an] actual disability if the person's medical condition or any of its symptoms is a "physical or mental" impairment that "substantially limits one or more major life activities." An individualized assessment is necessary to determine whether… a person's [disability] substantially limit a major life activity… Under the ADA, a physical impairment includes any physiological disorder or condition affecting one or more body systems. "Substantially limits" is construed broadly and should not demand extensive analysis. [The medical condition] need not prevent, or significantly or severely restrict, a person from performing a major life activity to be considered substantially limiting under Title I of the ADA.

https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#N

132.    One of the health condition that the plaintiff suffers from was first identified in 2018. It requires consistent cardiac monitoring with periodic testing.  Ms. Weber's doctor believes she may have been born with the cardiac condition.

133.    Hence, the condition is not transitory nor minor.  Had the Defendants allowed Plaintiff to submit her medical exemption to the COVID-19 vaccine, it would have been perfectly clear that her disability easily carries the Plaintiff's burdens as required by the ADA and outlined by the EEOC.

134.    Additionally, Ms. Weber is a cancer survivor which has required her to make significant changes to her lifestyle as a result of surviving such a significant illness.  Ms. Weber endured chemotherapy, radiation, as well as multiple surgeries that she has never fully recovered from.

135.    The permanent damage Ms. Weber suffered from the cancer and the treatments required her to go from a full-time to part-time employee while at HarborChase.

136.    Davenport, and therefore the Defendants, had full knowledge of the effects and nature of this disability.  However, the Defendants would not allow her to file for a medical exemption without "all" of her medical records.  Which were impossible to acquire by the documented mandate policy.

137.    Plaintiff informed her employer, the Defendant, that she was attempting to gather all required medical information to file for a medical accommodation.

138.    At the time of termination, Plaintiff rightfully believed her medical conditions precluded her from receiving a COVID-19 vaccine.

139.    The Defendant refused to engage in a meaningful interactive process

with the Plaintiff regarding her medical accommodation request and instead only responded to Plaintiff with questions designed to challenge the Plaintiff's rights to file for accommodations to the COVID-19 vaccine. The Defendant failed to allow the Plaintiff to request reasonable accommodations for her medical disabilities, instead terminating her.

140.     The Defendant bullied and discouraged Plaintiff to not file her medical exemption even if she was able to gather all required medical information (which she was unable to gather all the required medical information in about three weeks) to meet the arbitrary and prohibitively short timeline required to not be terminated.  Defendant's agents told Plaintiff it was a waste of time to file her exemption(s) and that it would be better for Plaintiff to simply quit.

141.     By discriminating against Plaintiff, because of her medical disability, in their decision to deny Plaintiff's accommodation opportunities, the Defendant violated the ADA. And this violation has harmed and continues to harm Plaintiff.

142.     The Defendant illegally and improperly did not identify potential accommodations as required by state and Federal law. The Defendant cannot assert the defense of direct threat because it did not assert, show, and/or provide any analysis into establishing a threat whatsoever in failing to even consider any accommodations for the Plaintiff's medical disability.

143.      It is reasonable to infer from the totality of the circumstances that Defendant did not bother engaging in an interactive process with those seeking medical exemptions because the Defendant intended to discriminate against those seeking medical exemptions and never intended to provide any reasonable accommodations.

144.     By failing to engage in the interactive process or offer any reasonable accommodations, the Defendant's discriminatory actions were intentional and/or reckless and in violation of the ADA.

145.     Due to the Defendant's improper, willful, intentional, and unlawful actions, and the subsequent harm suffered by the Plaintiff, the Plaintiff asks the Court for the relief requested in her Prayer for Relief.

## COUNT FOUR

### Violation of O.R.C. § 4112, *et seq.,*
### Disability Discrimination-Failure to Accommodate

146.     Plaintiff restates the foregoing paragraphs as if set forth fully herein.

147.     Plaintiff has a medical disability that precludes her from receiving a COVID-19 vaccine.

148.     The Defendant created such a hostile work environment that employees were bullied into not filing legally protected medical exemptions.

149.     Defendant's vaccine policy included a deadline for filing for a medical procedure and a requirement that "all" medical histories being included.  This requirement made it impossible for Ms. Weber to gather all the required medical documents to file her medical exemption before the Defendant's deadline.

150.     Defendants never documented their medical exemption policy. Instead, they explained it verbally only when employees went to them with their medical concerns of taking the COVID-19 vaccine.

151.     The lone documented vaccine policy made no mention of the Defendant's policy on submitting medical exemptions to the COVID-19 vaccine.  *See* **Exhibit A**

152.     The Defendant refused to engage in a meaningful interactive process with the Plaintiff regarding her medical accommodation request and instead only responded to Plaintiff with questions designed to challenge the Plaintiff's rights to file for accommodations to the COVID-19 vaccine. The Defendant failed to allow the Plaintiff to request reasonable accommodations for her disability, instead terminating her.

153.     The Defendant thereby discriminated again the Plaintiff because of her disability.

154.     By failing to engage in the interactive process or offer any reasonable accommodations, the Defendant's discriminatory actions were intentional and/or reckless and in violation of O.R.C. § 4112, *et seq*.

155.     It is reasonable to infer from the totality of the circumstances that Defendant did not bother engaging in an interactive process with those seeking medical exemptions because the Defendant intended to discriminate against those seeking medical exemptions and never intended to provide any reasonable accommodations.

156.     The Defendant illegally and improperly did not identify potential accommodations as required by state and Federal law. The Defendant cannot assert the defense of direct threat because it did not assert or show any hardship in declining to accommodate the Plaintiff's disability.

157.     By discriminating against Plaintiff, because of her disability, in their decision to constructively deny Plaintiff's accommodation, the Defendant violated O.R.C. § 4112, *et seq*. And this violation has harmed and continues to harm Plaintiff.

34

158.    Due to the Defendant's improper, willful, intentional, and unlawful actions and the subsequent harm suffered by the Plaintiff, the Plaintiff asks the Court for the relief requested in her Prayer for Relief.

## . PRAYER FOR RELIEF

For the foregoing reasons, Plaintiff respectfully requests that the Court grant the following relief:

A.  Payment for all economic damages, including, but not limited to, back pay, front pay and benefit in amounts to be determined at trial;

B.  Compensatory and consequential damages, and all non-economic damages, including for emotional duress;

C.  Punitive damages;

D.  Statutory damages;

E.  Pre-judgment and post-judgment interest at the highest lawful rate;

F.  An award of reasonable attorneys' fees, costs and expenses of all litigation to the extent allowable under federal and state law;

G.  Trial by jury on all triable issues; and

H.  Such other relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,

*/s/Glenn Feagan*_____
Glenn Feagan (Bar No. 041520)
Deters Law
5247 Madison Pike
Independence, KY 41051
Phone. (859) 363-1900
gfeagan@feaganlaw.com